

ENTERED
08/28/2013

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| REGINALD L. MARTIN | § | |
| MERINDA WATKINS-MARTIN | § | |
|     DEBTOR(S) | § | CASE NO. 06-32235-H5-13 |
| | § | |
| REGINALD L. MARTIN | § | |
| MERINDA WATKINS-MARTIN | § | |
|     PLAINTIFF(S) | § | ADVERSARY NO.  10-03501 |
| | § | |
| VS. | § | |
| HOME LOAN SERVICES, INC. | § | |
| DYCK O'NEAL, INC. | § | |
| FCI LENDER SERVICES, INC. | § | |
| STEEL CAPITAL STEEL, LLC | § | |
|     DEFENDANT(S) | § | |

## OPINION

Before the Court is the adversary proceeding brought by Reginald L. Martin and Merinda Watkins-Martin against Home Loan Services, Inc. [hereinafter "HLS"] alleging violations of the automatic stay and seeking

damages under 11 U.S.C. § 362(k).[1] This opinion considers the evidence and testimony of witnesses regarding liability of the Defendant for actions taken against the Martins' home. After due consideration, the Court finds that HLS repeatedly violated the automatic stay resulting in damages to the plaintiffs. A further hearing will be set to consider the amount of the Martins' attorneys fees and other damages, including possible punitive damages.

## I. Background

The Martins purchased their home at 2403 Beacon Pointe, Pearland, Texas 77584 in January 2003. On December 30, 2003, Merinda Watkins Martin executed a mortgage loan in favor of First Franklin Financial Corp. in the original principal amount of $265,500.00 bearing interest at an adjustable rate with an initial annual interest rate of 5.25%. The note does not require Mrs. Martin to establish an account with First Franklin

---

[1]The Martins also sued FCI Lender Service Inc., Dyck O'Neal, Inc., Steele Capital Steel LLC but dismissed FCI Lender Services Inc. Debtors proceeded to trial against Home Loan Services, Inc. The Martins' complaint against Dyck O'Neal, Inc. and Steele Capital Steel is still pending.

Financial Corp. to escrow ad valorem taxes and homeowners insurance. In connection with Mrs. Martin's execution of the mortgage loan in favor of First Franklin Financial Corp., the Debtors executed a deed of trust pledging 2403 Beacon Pointe, Pearland Texas, 77584, as security for the loan.[2]

At the inception of the notes, the monthly payment under the first lien note for principal and interest at 5.25% was $1,466.11. (D. Ex. 2. p1). The monthly payment on the second lien note was $631.13 per month. (First Franklin Financial Corp. proof of claims # 4 and 5).

Due to financial problems, the Martins missed two payments on their mortgages, totaling $4,930.40 (including late charges). Also, the Martins were delinquent on ad valorem taxes to the taxing authorities. The Martins filed Chapter 13 bankruptcy on May 31, 2006.

---

[2]In addition, First Franklin Financial Corp. funded a second lien note to Martin Watkins secured by the same property.

### a. The Martins repay their prepetition mortgage arrearage with an Agreed Adequate Protection Order.

On June 15, 2006, Debtors filed their chapter 13 schedules claiming Beacon Pointe as exempt under Tex. Prop. Code §§ 41.001 and 41.002. No creditor objected to the Martins' exemptions.

On November 13, 2006, the Martins filed an Agreed Adequate Protection Motion which was granted by this Court on November 17, 2006. (Main Case Doc. 57). This Court ordered  the Martins to repay their $4,930.40 mortgage arrearage to First Franklin Financial Corp. by paying monthly adequate protection payments of $821.73 ($600.84 for the first lien note and $220.90 for the second lien note) over six months beginning December 15, 2006. The Martins would pay these adequate protection payments along with their regular monthly payments of $1,716.68 for the first mortgage loan and $631.13 for the second mortgage loan. The adequate protection payments would equal the total amount due to First Franklin for the Martins' prepetition mortgage arrearage. The Agreed Order

does not alter the language in the first lien note which allows the Martins to pay their ad valorem taxes directly to the taxing authorities without the creation of an escrow.

The order further provides that, if First Franklin Financial Corp. does not receive the payments on or before the dates set forth in paragraphs 1 or 2, First Franklin Financial Corp. shall send written notice to Debtors and Debtors' counsel and allow Debtors a 10-day period to cure such delinquent payments. The order continues:

> In the event Debtors fail to cure such delinquent payment within such 10-day period or in the event Debtors become delinquent after one (1) notice of default, the automatic stay shall terminate as to First Franklin Financial Corp., a subsidiary of National City Bank of IN without further recourse to this Court and First Franklin Financial Corp., a subsidiary of National City Bank of IN shall be allowed to take any and all steps necessary to exercise any and all rights it may have in the collateral  . . .   Additionally, upon default, First Franklin Financial Corp., a subsidiary of National City Bank of IN shall notify the Court, Debtors and Debtors attorney and the Chapter 13 Trustee that the Automatic Stay has been terminated. Additionally, upon default, First Franklin Financial Corp.,a subsidiary of National City Bank of IN shall notify the Court, Debtors and Debtors' attorney and the Chapter 13 Trustee that

the Automatic Stay has been terminated.

Notwithstanding any provisions hereof, the automatic stay of 11 U.S.C. 362 shall terminate, if not sooner terminated as set forth in paragraph 3 above[3] upon entry of the Order of Discharge.

*Id*.

The Martins paid First Franklin Financial all prepetition mortgage arrearages as agreed and pursuant to the order. Consequently, the Court finds that this Order re: Adequate Protection regarding the Martins' residence had no further effect on the automatic stay. By agreement with First Franklin, if no default occurred in repayment of the prepetition mortgage arrearage, the automatic stay would continue in effect until the Martins received their Chapter 13 discharge.

**b. Home Loan Services disregards the confirmed plan.**

On February 23, 2007, this Court confirmed the Martins' third amended chapter 13 plan, which would pay, among other debts, the total prepetition ad valorem tax arrearage. (Main Case Doc. 65). The Martins

---

[3]The paragraphs are not numbered. The Court concludes that the Agreed Adequate Protection Order is clear in referring to the respective paragraphs *supra*.

completely paid off the plan over five years.[4]  Under the Martins' chapter 13 plan, "Property of the estate shall vest in the Debtors upon entry of the discharge order." (P. Ex. I. p8).

On October 17, 2006, the City of Pearland filed a proof of claim in the amount of $4,854.70.  On January 2,2007, Brazoria County MUD filed a proof of claim in the amount of $5,927.56. On the same day Brazoria County Tax Assessor filed a proof of claim in the amount of $16,194.69. These three claims total $26,976.91.

Pursuant to the confirmed Chapter 13 plan, from 2008 to 2010, the Chapter 13 Trustee paid City of Pearland  $3,605.05; Brazoria County MUD $4,591.09; Brazoria Tax Assessor $11,777.10. These payments total $19,973.24.

---

[4]The Martins' main case  remains open despite the trustee's Notice of Plan Completion. (Main Case Doc. 159).  In order to grant the Martins' discharge, this adversary must be resolved.

## Prepetition Proofs of Claim Filed by the Taxing Authorities

| Taxing Authority | Claim Amount |
|---|---|
| **Brazoria Tax Assessor** (claim #22) | $16,194.69 |
| **Brazoria MUD** (Claim #23) | $5,927.56 |
| **City of Pearland** | $4,854.70 |
| **Total** | **$26,976.91** |

Claims Register, Trustee Final Report, and Confirmed Chapter 13 plan

## Trustee Disbursements to Taxing Authorities

| | Principal | Interest | Total Disbursement |
|---|---|---|---|
| **Brazoria-Tax Assessor** 6/29/07 - 12/31/08 | $7,583.94 | $4,193.16 | $11,777.10 |
| **Brazoria MUD** 4/30/07 - 11/30/08 | $ 3,220.19 | $1,370.90 | $4,591.09 |
| **City of Pearland** 6/29/07 | $2,366.51 | $1238.36 | $3,605.05 |
| **TOTAL** | | | **$19,973.24** |

P. Ex. S and Proof of Claims Register

8

Over approximately, the first year and one half of their plan, February 2007 to December 2008, the Martins paid their Chapter 13 plan payments to the trustee, their post petition 2007 ad valorem taxes directly to the taxing authorities, and monthly mortgage payments to First Franklin without problems. However, sometime in 2008 First Franklin Loan Services assigned the mortgage servicing authority regarding the Martins' loans to HLS d/b/a/ First Franklin Loan Services. Even though the mortgage servicer changed, First Franklin Financial Corp. remained the note holder on the Martins' loans.

On December 2, 2008, Mrs. Martin paid $4,356.03 on the Debtors' 2008 ad valorem taxes owed to Brazoria County Tax Office in advance of the January 31, 2009 due date. Mrs. Martin testified that Brazoria County allows taxpayers to pay annual taxes in two partial payments over six months.

On December 31, 2008, HLS, a/k/a First American Real Estate Tax improperly paid the Martins' 2005, 2006 prepetition tax arrearage. HLS

also paid the Martins' remaining 2008 taxes which were not then due. The total paid was $17, 674.32. (P. Ex. J-Brazoria County Tax Assessor Duplicate Tax Receipt). By paying the 2005 and 2006 taxes which were included in the confirmed Chapter 13 plan, HLS disregarded the Chapter 13 plan entirely.[5]

In January 2009, Mrs. Martin called the office of MUD #26 to arrange for payment of their 2008 taxes. She was informed that her taxes had been paid current. Only then did the Martins discover that HLS had improperly paid the remaining taxes included in the Martins' plan. (D. Ex.19, The Payment Information sheet from the Brazoria County Tax Office).

Thereafter, Mrs. Martin repeatedly called HLS, trying to explain that their tax arrearage should not have been paid because those debts were included in the Martins' confirmed chapter 13 plan. In response, a HLS employee told Mrs. Martin that HLS could do whatever it pleased with the

---

[5]HLS' principal, First Franklin Financial, did not object to the Martins' paying taxes through the chapter 13 plan. Consequently, HLS must show why it was not bound by the confirmed plan as was its principal.

Martins' loans.

Some time in early 2009, HLS sent Mrs. Martin an Annual Escrow Account Disclosure Statement Account Projection dated December 26, 2008. (P. Ex. U). This Statement showed that as of February 28, 2009, the Martins' Current Escrow Account Projection was

> -$24,781.72... YOUR STARTING BALANCE ACCORDING TO THIS ANALYSIS SHOULD BE $1,104.25. THIS MEANS YOU HAVE A SHORTAGE OF $25,885.97. THIS SHORTAGE MAY BE COLLECTED FROM YOU OVER A PERIOD OF 12 MONTHS OR MORE...WE HAVE DECIDED TO COLLECT IT OVER 12 MONTHS...YOUR MONTHLY MORTGAGE PAYMENT FOR THE COMING YEAR WILL BE $4,399.64...

**c. Home Loan Services, refuses to accept the Martins' regular payments unless the Martins begin repaying their prepetition tax arrearage.**

Thereafter, in April 2009, HLS refused to accept the Martins' regular monthly payment of $1,716.68, demanding monthly payments of $4,423.19 to begin May 2009 to cover the escrow arrearage created by HLS's improper payment of prepetition taxes. (P. Ex. U and testimony of Miranda Watkins-Martin).

11

In June 2009, Calvin Braun, an attorney acting for the Martins, began a series of emails with counsel for HLS, Mitchell Buchman. In response, Mr. Buchman denied that his client was rejecting payments and told Braun to have the Martins try again to mail their mortgage payments to HLS Buchman further stated, "I need to gather more information, but we should be able to resolve this so that the debtor does not pay any more for taxes than she was paying under her plan or her agreements with the various taxing authorities." (P. Ex. HH. p1).

However, despite the reassurance that HLS would accept the Martins' regular payments, on June 10, 2009, HLS sent the Martins a letter demanding payment to HLS of $8,881.38 within 10 days. (P. Ex. L). On June 15, 2009, Braun alerted Buchman that the HLS default/demand letter violated the automatic stay. Braun urged Buchman to respond quickly, "as my client is on the edge of an emotional breakdown with the thought of losing her home." (P. Ex. HH. p4). Buchman replied, "if my client has paid the pre-petition taxes and added those amounts to the post-petition escrow

calculations, I will request that my client re-analyze escrow." (P. Ex. HH. p3). Buchman immediately withdrew the June 10, 2009 default letter.

Because HLS continued to reject Debtors' regular monthly mortgage payments, Braun and Buchman agreed that the Martins would send their checks to the law firm of Adair and Myers which would then forward the checks to Mr. Buchman. (P. Ex. HH. p5-7 and p11-15). Buchman would then forward the checks to his client directly. From May, 2009 to September, 2009, the Martins made their mortgage payments through the attorneys.

Thereafter, Mrs. Martin stopped sending her mortgage checks via the attorneys because HLS still refused to cash the Martins' checks even though it had received them from its attorney, Mr. Buchman. HLS never corrected its improper escrow arrearage claims against the Martins. Later the Martins began to send all their monthly mortgage payments to the chapter 13 trustee because HLS would still not accept them. (Trustee's Final Report and Account). The Martins filed Adversary proceeding no. 10-

3501 on October 14, 2010.

In 2008 when it was assigned the mortgage servicing authority, HLS failed to comply with Fed. R. Bankr. P.3001(3)(4) (Transfer of claim for security after proof filed) which required a transferee to notify all parties of the terms of transfer. Since HLS also failed to file a notice of appearance, the Court was unaware HLS was participating in the case. Finally, on March 12, 2010, HLS filed notices of transfer of claims with this Court showing that claims of Brazoria County and Brazoria County MUD #26 were transferred to HLS (D. Ex. 8 and 12 - Notices of Transfers for Claim #22 and #23).

On June 1, 2010, HLS filed with the Court a notice of payment adjustment which showed an escrow balance due on the Martins' note of $19,656.65. Consequently, HLS was demanding payment from the Martins for the same tax arrearage on which  it was being paid by the trustee.

Despite its withdrawal of the June 10, 2009 default letter, on April 16, 2010, HLS again sent the Martins a Notice of Default demanding payment

14

of $ 18,588.20 within 10 days. (D. Ex. 18).

From March 31 to August 31, 2010, the Chapter 13 trustee paid HLS a total of $9,464.11. (P. Ex. S Trustee Financial Record page 1-2). The trustee was paying the proof of claim #22 filed by HLS for the Martins' 2005 and 2006 arrearage.

**Trustee Disbursement to Mortgage Servicing Companies**

|  | **Principal** | **Interest** | **Total Disbursement** |
|---|---|---|---|
| **Home Loan Services 3/30/10-8/31/10** | $8,830.72 | $633.39 | $9,464.11 |
| **FCI Lenders 7/31/12** | $52,001.56 | $7,130.05 | $59.131.61 |

HLS continued to service the Martins' loans until February 7, 2012, when First Franklin Financial transferred the first lien note to Steele Capital Steel, LLC. (D. Ex. 14 - Notice of Transfer for Claim #23). FCI Lender Services, Inc. is the servicing company for Steele Capital Steel, LLC. Steele Capital Steel and FCI Lender Services filed proofs of claims in which they

assert they were owed monies which included the Martins' prepetition tax arrearages.

## Home Loan Services Tax Payments to
## Brazoria Taxing Authorities and MUD # 26

| Tax year | Payment |
|----------|---------|
| 2005 | $1,589.20 |
| 2006 | $11,466.69 |
| 2008 | $4,356.03 |
| MUD # 26 | $6,370.76 |
| **TOTAL** | **$23,782.68** |

Duplicate Tax Receipt

## Home Loan Services Charges to the
## Martins' Escrow Balances

| Date | Balance |
|----------|---------|
| 11/24/08 | -0- |
| 12/23/08 | $ 18, 410.86 |
| 12/23/08 | $   6,370.76 |
| 12/24/08 | |
| **TOTAL** | **$ 24,781.52** |

### d. Home Loan Services fails to credit the Trustee's payments to the Martins' escrow balance.

Two years later in December 2010 when HLS finally filed notices transferring the taxing authorities' claims to itself, HLS began to receive payments from the trustee. Thereafter, HLS records and credits only part of the trustee's payments against the Martins' escrow balance. For example:

| Date | Trustee Pays Home Loan Services | Home Loan Services Receives | Credited to Escrow Starting balance[6] -$24,257.36 |
|---|---|---|---|
| 03/31/10 | $  710.20 (P)<br>$  113.19 (I) | | -0- |
| 04/06/10 | | $ 626.42<br>$ 196.97<br>$ 823.39<br>- 113.19 (late fees)<br>$ 710.20 | $  710.20 |
| 04/30/10 | $  635.94 (P)<br>$  120.88 (I) | | |

---

[6]These credits do not include the Martins' $2,227 monthly mortgage payment of which $ 511.19 went to reduce escrow.

| | | | |
|---|---|---|---|
| 05/05/10 | | $  158.88<br>$   597.94<br>-120.88(late fees) | -0- |
| 05/31/10 | $ 642.30 (P)<br>$ 114.52 (I) | | |
| 06/04/10 | | $  158.88<br>$   597.94<br>-114.52(late fees) | -0- |
| 06/30/10 | $648.73 (P)<br>$ 108.09(I) | | |
| 07/07/10 | | $  158.88 (I) | |
| 07/09/10 | | $   597.94 (P)<br>$     85.83 late fees | $ 597.94 |
| 07/31/10 | $  655.21 (P)<br>$   101.61(I.) | | -0- |
| 08/04/10 | | $ 597.94<br>$ 158.88<br>$ 756.82 | $    756.82 |
| 08/31/10 | $5,538.34 (P)<br>$     75.10 (I) | | -0- |
| 09/09/10 | | $5,613.44 | -0- |
| 09/15/10 | | $     85.83 late fee | -0- |
| Total | $8,707.29 | $ 9,464.11 | $ 2,064.96 |

P. Ex. S, Trustee Final Report and Account, D. Ex. I, Main Case Doc.152, 178.

### e. FCI Lender seeks relief from stay and demands payment for Escrow Shortages attributable in part to Home Loan Services' Failure to Credit payments by the Chapter 13 trustee.

On May 24, 2012, FCI Lender Service, Inc. filed a Motion for Relief from Stay, alleging that the Martins owed $354,538.59 as the balance due on the first lien on their home and a post-petition arrearage of $109,509.00. FCI Lending alleged that the Martins' mortgage arrearage included $52,740.44 in advanced escrow. (Main Case Doc.152- FCI Lenders' Motion For Relief From Stay Regarding Non-Exempt [sic] Property).

On July 7, 2012, an Agreed Order Conditioning the Automatic Stay was entered authorizing a payment or $44,015.80 to FCI Lenders. (Main Case Doc. 152). The trustee released a single payment of $33,299.45 to FCI. The lower amount reflects the available funds for dispersal in the trustee's account. The remaining alleged balance of $10,716.35 was to be paid by the Martins. (P. Ex. S- Trustee financial record p. 1).[7] The Agreed Order specifically stated that the Martins could make their ad valorem tax

---

[7] The Agreed Order between the Martins and FCI Lenders improperly included $8,086.87 in unauthorized attorneys fee expenses.

payments directly to the taxing authorities.[8]

In addition, the Martins made direct payments to FCI Lenders from November 24, 2008, to September 14, 2011 of $41,051.94. (Main Case Doc. 152). These $41,051.94 were made by the Martins at a time when FCI told the Martins they owed an escrow arrearage of $52, 740.41. The total amount paid to FCI Lenders by both the Martins and the trustee totals $100,183.55. (Main Case Doc. 152 and P. Ex. S).

### f. Home Loan Services and First Franklin transfer the Martins' first lien note to Steele Capital Steel and FCI Lender Services without reducing the Martins' escrow balance by the trustee's payments.

First Franklin Financial transferred the first lien mortgage to Steele Capital Steel and its servicer, FCI Lender Services Inc. a/k/a Steele Capital Steel. The last escrow balance shown by HLS is $ 20, 658.83. The first escrow balance shown by FCI as of November for the first lien is $20,658.83. (P. Ex. S)

The Court finds that HLS received $8,707.29 in interest from the

---

[8] The Agreed Order dismissed FCI with prejudice from the adversary proceeding.

Chapter 13 trustee to pay the Martins' prepetition tax arrearage. HLS failed

to credit the Chapter 13 Trustees' payments to the Martins' ad valorem

prepetition tax arrearage. HLS failed to show why it was entitled to receive

12% interest or charge late fees for receipt of payments from the Chapter

13 trustee.[9] In addition, HLS failed to show that it credited the Martins'

escrow account with all payments it received from the Chapter 13 trustee.

Instead of $8,707.29, HLS only credited $2,064.96 to the Martins'

prepetition tax arrearages.

## II. Argument

### a. Law Regarding Automatic Stay

11 U.S.C. §362 (a)(3) reads:

...

any act to obtain possession of property of the estate or of
property from the estate or to exercise control over property of
the estate;

The Bankruptcy Code creates a private right of action for violations

---

[9]Assuming HLS was entitled to any interest, the deed of trust only allows the lender to charge debtors interest at the then current contract rate. (D. Ex. 3 Deed of Trust p. 9 of 16 paragraph 9-10.)

of the automatic stay.

> (k)(1)Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including cost and attorney's fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. §362(k)(1); see *Pettit v.Baker*, 876 F.2d 456, 457 (5th Cir. 1989).

> The three elements for a claim under Section 362(k) are: (a) the creditor must have known of the existence of the stay; (2) the creditor's actions must have been intentional; (3) the actions must have violated the stay.

*In re Repine*, 536 F.3d 512, 520 (5th Cir. 2008).

> Moreover, a willful violation:

> does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*In re Taylor,* 884 F.2d 478, 482 (9th Cir. 1989), quoted by the Court in *In re Chesnut,* 422 F.3d 298, 302 (5th Cir. 2005).

> It is uncontested that HLS knew about the Martins' bankruptcy and

22

acted intentionally. The only question for this Court is whether HLS' actions violated the automatic stay.[10]

Defendant HLS argues its actions were lawful because: (1) any default letters or notices of arrearages were sent pursuant to the November 17, 2006 Agreed Adequate Protection Order between the Martins and First Franklin; (2) the June 2009 default letter was immediately withdrawn by Mr. Buchman as soon as he received notice form Mr. Braun; (3) pursuant to the loan documents, HLS was entitled to pay the Martins' tax arrearage; and (4) First Franklin did not withdraw its proof of claim and as its servicer, HLS could assert rights on its behalf. Also, HLS objected to the admissibility of P. Ex. HH (the Braun/Buchman e-mails) and the Court will address this evidentiary issue in this opinion. Lastly, HLS argues, even if it violated the stay, the Martins suffered no damages.

---

[10] This issue is complicated because HLS included both pre- and post petition taxes in its demands. The Automatic stay applies only to prepetition debts. *In re Ripley*, 926 F.2d 440, 443 (5th Cir.1991).

### b. Were Home Loan's Annual Escrow Disclosure Statement and its default letters issued pursuant to the Agreed Adequate Protection Order?

HLS contends that the default communications with the Martins were allowed by the November 17, 2006, Agreed Adequate Protection Order. (Main case, Doc. 57). In that Order this Court approved the agreement between First Franklin Financial Corp. and the Martins whereby the Martins would repay their prepetition mortgage arrearage over six months.[11] If the Martins failed to make the agreed adequate protection payments, they would be allowed one 10-day period to cure a delinquent payment by certified funds. "In the event Debtors fail to cure such delinquent payment within such 10-day period or in the event Debtors become delinquent after one notice of default, the automatic stay will terminate as to First Franklin Financial Corp.... In that event First Franklin could exercise its rights in the collateral without seeking further orders from this Court." (Doc. 57 p1-2).

---

[11]This payment was for both the first and second lien arrearages.

The Agreed Order is internally contradictory because the opening phrase in the last paragraph on page one of the order reads:

> **ORDERED** that on or before December 15, 2006, and on or before the fifteenth day of each month thereafter through the discharge date, Debtors shall remit adequate protection payments... .

Such language suggests that the Adequate Protection Order would be in effect until the Martins received their bankruptcy discharge. However, that reading is nonsensical in the context of the entire order. First Franklin never claimed that the Martins were required to pay Adequate Protection payments throughout the five year plan. Instead, the parties agreed that the Martins' prepetition mortgage arrearage would be repaid in six months.

The Agreed Order goes on to explain the impact of default on the automatic stay:

> In the event Debtors fail to cure such delinquent payment ... the automatic stay shall terminate as to First Franklin Financial Corp. ... without further recourse to this Court ...

The final paragraph of the Agreed order states:

Notwithstanding any provisions hereof, the automatic stay of 11 U.S.C. §362 shall terminate, if not sooner terminated as set forth in Paragraph 3 above, upon entry of the Order of Discharge.

*Id.*, p. 3.

This Court finds that First Franklin Financial Corp and the Martins agreed and this Court ordered contingent relief from the automatic stay solely for repayment of the prepetition arrearage owed to First Franklin. It is undisputed that the Martins satisfied the terms of the Order and repaid the prepetition mortgage arrearage. Consequently, Section 362 remained in effect and was not altered by the Adequate Protection Order.

Moreover, HLS's December 26, 2008 Annual Escrow Account Disclosure Statement Account Projection and April 16, 2010 Notice of Default letter, demanding payment of $18,588.20 within 10 days, addressed both pre- and post petition tax arrearage, not prepetition mortgage arrearages covered by the Agreed Order. (P. Ex. P & U). The Court concludes HLS has failed to prove that its default notices sent over a year after the Martins repaid their prepetition mortgage arrearages were issued

pursuant to this Court's Adequate Protection Order.

### c. Did the prompt withdrawal of the default letter nullify violations of the automatic stay?

HLS argues that its prompt withdrawal of the default letter eliminated or mitigated any violation of the stay. However, from January 2009 when Mrs. Martin alerted HLS's employees that the prepetition tax arrearage was improperly paid up until September 2010 when HLS and First Franklin transferred the first lien note to Steele Capital Steel for servicing by FCI, HLS completely disregarded for the automatic stay.

Apart from the 2009 and 2010 default letters, HLS refused to accept the Martins' regular monthly mortgage payments while demanding repayment of prepetition debts. HLS filed a proof of claim to allow the trustee to repay the Martins' tax arrearages, but  at the same time HLS demanded that the Martins repay the same 2005 and 2006 tax arrearage. Withdrawal of the default letter does not change HLS' rejection of the Martins' regular loan payments.

**d. Was Home Loan Services entitled to pay off prepetition tax arrearages included in the confirmed Chapter 13 plan?**

HLS relies on language in the original loan documents which reads:

Deed of Trust

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's Interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations)...
Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts hall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(D. Ex.3)

First Franklin Financial Corp., HLS' principal, actively participated in the Martins' bankruptcy. The Court holds First Franklin Financial was bound by the Martins' plan under 11 U.S.C. § 1327 which reads:

(a) The provisions of a confirmed plan bind the debtor and each

creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

11 U.S.C. § 1327 (a)

As the agent of First Franklin, HLS was also bound by 11 U.S.C. 1327(a). A confirmed Chapter 13 plan is res judicata. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1049 (5th Cir. 1987).

Moreover, First Franklin withdrew its proofs of claims #4 and #5 on October 26, 2006. HLS did not file its own proof of claim until January 12, 2009, long past the claims bar date of October 17, 2006. (Main case Doc. 12.) HLS attempted to back date its own claim to coincide with the original date of First Franklin's proofs of claims, June 16, 2006. Consequently, the question is whether HLS's late-filed claim regarding a prepetition tax debt can revive a withdrawn claim for prepetition mortgage payment arrearage.

A secured creditor may choose not to file a proof of claim; in which case the lien passes through the bankruptcy unaffected. Rule 3002(a); *In Re Dumain*, 492 B.R. 140 (Bankr. S.D. N.Y. 2013). Moreover, a creditor may

withdraw a proof of claim "unless...an objection is filed thereto or a complaint is filed against that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case." Fed. R. Bankr.3006.[12] However, a creditor must file a proof of claim in order to have an allowed claim for distribution. 11 U.S.C. § 502(a). If a creditor withdraws a proof of claim, its claim is a nullity. *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("We conclude that the successful withdrawal of a proof of claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversary proceeding renders the claim a legal nullity and leaves the parties as if the claim had never been brought.").

Even assuming, as HLS argues, First Franklin did not withdraw its proof of claim or its withdrawal had no effect, the question remains whether HLS could transfer and, thereby, amend the First Franklin claim to pay off the Martins' prepetition tax arrearage and receive payments from

---

[12]However, a creditor must file a proof of claim in order to have an allowed claim for distribution. 11 U.S.C. §502(a).

the Martins' Chapter 13 plan.

Fifth Circuit law regarding amendments of Proof of Claims is:

> Amendments do not vitiate the role of bar dates: indeed, courts
> that authorize amendments must ensure that corrections or
> adjustments do not set forth wholly new grounds of liability.
> While helpful, these considerations are overlapping and seem
> to subsume two general questions: (1) whether [the creditor] is
> attempting to stray beyond the parameters of the original proof
> of claim and effectively file a 'new' claim that could not have
> been foreseen from the earlier claim or events such as an
> ongoing or recently commenced audit; and (2) the degree and
> incidence of prejudice, if any, caused by [the creditors's] delay.

*In re Kolstad*, 928 F.2d 171, 175 (5th Cir. 1991), n.7.

While HLS was the authorized mortgage servicer of First Franklin,
its claim was based on an entirely different debt, pre-and post petition tax
arrearages, from that of First Franklin's prepetition mortgage arrearage. For
that reason, HLS's 2009 proof of claim may not amend and does not relate
back to the date of First Franklin's 2006 proof of claim.

### e. Home Loan's Objection to Plaintiffs' exhibit HH.

Despite HLS's objections that P. Ex. HH contained settlement

31

discussions limited by Fed. R. Evid. 408, the e-mail statements by Mr. Buchman and Mr. Braun maybe admitted for the purpose of showing that HLS had notice of the problems it had created for the Martins. *Athey v. Farmers Ins. Exch.*, 234 F.3d 357 (8th Cir. 2000) (Holding that evidence of settlement negotiations are admissible to show bad faith); *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477 (7th Cir. 2000) (Holding that evidence about the corporate president's actions in the course of negotiations are admissible to show course of conduct and intent); *Savoy IBP 8, Ltd. v. Nucentrix Broadband Networks, Inc.* 333 B.R. 114 (Bankr. N.D. Tex. 2005) (Holding that there is no abuse of discretion in admission of settlement discussion by the bankruptcy court to show the state of mind and explain actions of parties.). Consequently, all pages of P. Ex. HH are admitted except page 10.[13]

## III. CONCLUSION

For these reasons, and because HLS failed to credit the Chapter 13

---

[13]By prior order, this Court refused to admit page 10 of exhibit HH. That page reflects too much possible prejudice to HLS under Fed. R. Ev. 403.

trustee's payments to the Martins' escrow account, and insisted on collecting from the Martins' their prepetition tax debt, the Court finds that HLS violated the automatic stay.

A continued hearing on damages is set for November 7, 2013 at 9:30 am in Courtroom 403, 515 Rusk St., Houston, TX. 77002.

Signed this 28ᵗʰ day of Aug., 2013, at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE

33